IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00564-MEH

THOMAS JOSEPH POWER,

        Plaintiff,

v.

ANDREW M. SAUL, Commissioner,
Social Security Administration,

        Defendant.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge.**

        Plaintiff applied for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 405, 1383. An Administrative Law Judge ("ALJ") rendered a decision finding Plaintiff not disabled under the SSA's terms. The Appeals Counsel denied his Request for Review, thereby leaving the ALJ's decision final and subject to judicial review. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist in the appeal's determination. After consideration of the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

## BACKGROUND

### I.    Employment and Treatment History

        On January 14, 2005, Plaintiff slipped and fell on ice while pushing shopping carts at his job at Walmart. Dr. Bradley treated him for low back and hip pain. In a Functional Capacity

Evaluation report dated May 12, 2005, Plaintiff was rated at an eight percent whole person impairment. Plaintiff remained capable of heavy and medium lifting. AR 288–313. On June 21, 2005, Dr. Bradley wrote a second report with a diagnosis of mild degeneration at the L5/S1 disk without stenosis. He saw no need for further treatment or medication and gave Plaintiff a thirteen percent whole person impairment rating. Dr. Bradley opined that Plaintiff can lift up to 100 pounds. AR 314–16.

On November 15, 2005, Plaintiff had another workplace injury, this time affecting his left shoulder. Treatment for it included surgery and pain medication. AR 317. On June 14, 2006, Dr. Soffer rated Plaintiff as thirteen percent impaired (whole person) from depression. On May 12, 2007, Dr. Bradley wrote a report finding Plaintiff to be fourteen percent impaired (whole person) from left shoulder impingement syndrome. Plaintiff was limited to lifting or carrying fifteen pounds and no overhead work. AR 317–19.

Plaintiff's employment at Walmart ended in 2006. AR 52. Next, he worked as a shuttle driver for a railroad company until 2008. AR 54. Most recently, he was employed as a concrete and dump truck driver for a gravel company. There are no medical records from this time.

The medical record resumes on December 23, 2011 when Plaintiff injured his right shoulder while shoveling snow at work. AR 321. Plaintiff was placed on restricted work duty, with lifting limited to five pounds and no overhead reaching or activity above chest level. AR 322. Plaintiff claims a disability onset date of February 1, 2012. AR 234. He was 42 years old at the time. AR 322.

Physical therapy, which began on January 14, 2012 (AR 2464), did not relieve his right shoulder pain, and an orthopedist, Dr. Nolan, recommended surgery to repair partial rotator cuff tears (AR 356). An ECG taken in preparation for the surgery was normal. Plaintiff reported an

active lifestyle and independent household and yardwork activities without exertional limitation. AR 2767. Plaintiff stated that he was not working at that time because his truck had broken down. AR 356. Dr. Nolan performed the surgery on March 19, 2012 (AR 1961), and physical therapy continued (AR 2443). In May and again in August of 2012, Plaintiff reported to Dr. Nanes ongoing significant pain despite surgery, physical therapy, and prescription pain medication. AR 421, 486.

On September 12, 2012, Dr. Ridings conducted a nerve test for Plaintiff's complaint of right arm paresthesia. The test showed only mildly abnormal findings, and Dr. Ridings attributed the symptom to a pre-existing, separate carpal tunnel syndrome condition. AR 489. An MRI of the right shoulder on September 14, 2012 showed bursitis, a possible tendon tear with tendinopathy, and a small labrum cyst. AR 496.

On September 24, 2012, Plaintiff began treatment with the orthopedist, Dr. Weinstein. Dr. Weinstein recommended surgery (AR 499), which took place on December 6, 2012 (AR 531). At later appointments with Dr. Weinstein and Dr. Schwender in 2013, Plaintiff stated that the ongoing treatment had not eased his shoulder pain. AR 556, 569. On April 1, 2013, Dr. Weinstein observed only mild tenderness, and he saw no objective abnormality that correlated with the degree of pain reported. AR 582. Dr. Weinstein saw no need for repeat surgery but instead recommended pain management (for which Plaintiff already was seeing Dr. Sparr). AR 598, 624.

On July 3, 2013, Plaintiff told Dr. Nanes that significant right shoulder pain remained. Dr. Nanes described the condition as complex and difficult, and at Plaintiff's request, referred him to Dr. Ciccone for further treatment. AR 626.

Dr. Ciccone saw Plaintiff on December 10, 2013. Pain complaints and guarding limited the extent of the physical examination; Dr. Ciccone found it difficult to discern whether Plaintiff's shoulder was genuinely stiff or whether he was overly guarding it. A nerve conduction study

performed by Dr. Kedlaya on December 3, 2013 was normal. Dr. Ciccone diagnosed scapular dyskinesis, and for treatment, he recommended physical therapy, pain management, and Lyrica. Surgery was not recommended. AR 663.

On January 15, 2014, Dr. Olson cleared Plaintiff for a trash pick-up job organized by the Workers Compensation insurer. AR 681.

Plaintiff continued to complain of severe pain despite treatment. Therefore, on January 29, 2014, Dr. Nanes referred Plaintiff to the specialist, Dr. Hatzidakis, for an expert opinion. AR 688. Dr. Hatzidakis examined Plaintiff on April 10, 2014. He observed mild tenderness, a reduced range of motion, but full strength in the right shoulder. The doctor advised him that he must work through the discomfort to benefit from physical therapy. He read a recent MRI as showing some objective defects, but nothing that would account for the degree of pain that Plaintiff claimed. Dr. Hatzidakis suspected either a low-grade infection, rotator cuff tear, symptomatic joint arthrosis, or pain aversion. AR 695-98.

Dr. Nanes noted good findings from his examination of Plaintiff's shoulder on June 4, 2014. He changed Plaintiff's work status from off-work to restricted duty, and he anticipated that maximum medical improvement ("MMI") would be reached by August. AR 2924. Dr. Parker concurred that Plaintiff was nearing MMI. He noted the lack of improvement despite 160 physical therapy sessions and two surgeries. Dr. Parker declined Dr. Nanes' request for additional physical therapy. AR 735. At an appointment with Dr. Nanes on July 30, 2014, Plaintiff complained of swelling in his extremities (ankles, arches, wrists, and hands) as well as ongoing shoulder discomfort and reduced functional ability. AR 2918.

On September 4, 2014, Duane Fenton, PA-C, at Dr. Hatzidakis' practice, noted that "[a]t this point [Plaintiff] is highly considering surgical intervention." AR 3029. On September 12,

2014, Dr. McElhinney approved Dr. Hatzidakis' surgery request (AR 2478), and that surgery—the third on Plaintiff's right shoulder—was performed on September 26 (AR 842). At a later appointment with Dr. Nanes on October 15, 2014, Plaintiff reported still ongoing severe right shoulder pain. AR 2913.

The physical therapist's notes mention no problem or injury event during the preceding treatment sessions (AR 2707–09), but on January 8, 2015, Plaintiff reported to Dr. Hatzidakis that his physical therapist had overworked his shoulder ten days earlier, with resulting pain exacerbation. Plaintiff reported the re-injury event to Dr. Nanes as well. Physical therapy was suspended for two months. AR 2907.

When Dr. Hatzidakis examined Plaintiff's shoulder on March 11, 2015, he observed a reduced range of motion but only mild weakness. AR 1022. Dr. Hatzidakis interpreted an MRI taken on March 31 as showing no evidence of new tearing or pathology, only post-surgery changes. AR 1250. Rose Christensen, PA-C, at Dr. Hatzidakis' practice, examined Plaintiff on April 22, 2015. She observed a reduced range of right shoulder motion but full strength. In addition to severe shoulder pain, Plaintiff reported occasional neuropathy in his right wrist. Ms. Christensen limited right upper extremity use to lifting no more than five pounds and no overhead activity. AR 1020. On August 17, 2015, Dr. Paz filled out a Workers Compensation form indicating the work restriction of no lifting or carrying any weight but not restricting standing, walking, or sitting during a full workday. AR 2498.

Beginning in May 2015, Plaintiff began seeing Dr. Reitter over concerns about a possible recurrent hernia. Dr. Reitter found no abnormality at that time, AR 3214–40, but three years later, in July 2018, Dr. Reitter observed a hernia in need of surgical repair. AR 3208.

Because of the potential re-injury event at physical therapy, Dr. Hatzidakis operated on Plaintiff on September 4, 2015. AR 964. This was the fourth—and final—surgery on the right shoulder. Plaintiff remained in physical therapy. There were signs of significant improvement afterwards. AR 1013, 1350. Increased use of the arm was recommended. AR 1375. Dr. Hatzidakis continued the five-pound lifting restriction given after surgery, but he added that Plaintiff's pain complaints exceeded what otherwise would be expected. AR 1009.

In February 2016, Plaintiff began to complain about pain in his left shoulder. Doctors were unsure whether over-use was causing the pain and whether it related to a prior workplace injury that the Workers Compensation insurer would cover. AR 1481. In a letter to Plaintiff's attorney on June 14, 2016, Dr. Hatzidakis described Plaintiff's shoulder conditions as a healed subscapularis without complication and some post-surgery tendon change on the right and pain from over-use on the left. AR 1008.

On May 16, 2016, Plaintiff drove across a patch of ice and lost control of his car, resulting in a severe accident. He was taken to the hospital. There was no acute severe injury, and initially he resisted admission, preferring to go home. AR 1006, 1171, 1790. Radiographs showed fractures in the L2 disk and left ankle as well as injury to the left elbow and shoulder, but they were all mild in degree. AR 1195, 1798, 1821–23. Dr. Weinstein examined him in the hospital. He saw no outward signs of pain when observing Plaintiff passively. The upper extremities had full to nearly full ranges of motion. There was much guarding of the left elbow and ankle. Only conservative treatment, and no surgery, was recommended. AR 1809. An MRI of the right shoulder taken on May 31, 2016, after the car accident, showed intact surgical repairs and no significant changes. AR 1094, 1585.

The pilon tibia fracture in his ankle was barely visible. Dr. Shank saw no objective abnormality to correlate with Plaintiff's pain complaints, and Plaintiff had not complied with the instruction to avoid weight-bearing on the ankle. Dr. Shank recommended conservative treatment measures, but on June 15, 2016, surgery was performed, at Plaintiff's election, to secure the fracture displacement. AR 1002, 1821–23, 1833, 2033. At follow-up appointments, Dr. Shank observed normal healing and no abnormalities, although Plaintiff continued to complain of pain and numbness despite physical therapy. AR 1159, 1162.

Dr. Weinstein evaluated Plaintiff's left elbow injury on August 24, 2016, observing only mild abnormalities and no instability. Dr. Weinstein diagnosed myofascial symptoms, for which he recommended anti-inflammatory medication and soft-tissue physical therapy. AR 1164. At a follow-up appointment, Dr. Weinstein diagnosed a contusion, myofascial inflammation, and collateral ligament injury. He observed mild, diffuse tenderness but a full range of motion. Plaintiff's left leg was normal, except for mild swelling and bruising. AR 1161.

On August 2, 2016, Dr. Lindberg wrote an IME report after reviewing the treatment history and examining the Plaintiff. He opined that the snow-shoveling injury had caused only impingement syndrome and irritation of the right shoulder, which Dr. Nolan had treated. He observed full strength in the right arm and no numbness in the right hand. Regarding the left side, he saw no pathology, and he disagreed that over-use could cause the complained-of symptoms. He saw no objective abnormality to explain Plaintiff's pain complaints. He saw no need for further treatment and imposed no activity restrictions. He declared Plaintiff to be at MMI with a fourteen percent whole person impairment rating. AR 1579–87.

Dr. Hatzidakis agreed that Plaintiff's right shoulder was at MMI. However, he countered that over-use could be the cause of the left shoulder pain complaint and that the condition warranted treatment. AR 1001–05.

On October 14, 2016, Plaintiff saw Dr. Olson for his shoulder conditions. Dr. Olson observed signs of mild discomfort, with a reduced range of right shoulder motion, but a normal range of left shoulder motion. He described Plaintiff's case as complicated and recommended ongoing physical therapy. AR 1608. Dr. Olson examined Plaintiff again on November 21, 2016. AR 1644. On November 22, 2016, he wrote a report in which he declared Plaintiff to be at MMI with a fourteen percent whole person impairment. He limited right arm use to lifting no more than ten pounds on an occasional basis and only to chest level. He advised against forceful pushing, pulling, or torqueing with the right arm, and he advised against ladder climbing or crawling. AR 1638–40. He repeated those limitations on January 3, 2017. AR 1669–70.

On November 7, 2016, Plaintiff applied for Title II disability insurance benefits. AR 198. On January 9, 2017, he applied for Title XVI supplemental security income. AR 202.

On January 17, 2017, Plaintiff saw Dr. Paz for the recent onset of back pain without a precipitating injury event. Dr. Paz diagnosed low back strain. Plaintiff reported that chiropractic treatment was providing some relief. AR 2056.

On February 2, 2017, he saw Dr. Davis for a right ankle injury after slipping on ice. An x-ray showed an isolated malleolar fracture of the fibula with minimal displacement. His leg was placed in a cast. AR 1866, 1868, 1911. Dr. Shank examined the condition on March 7, 2017. He observed minimal tenderness and described Plaintiff as doing well with conservative treatment. AR 1989.

Dr. Herbert performed a consultative examination of Plaintiff on March 18, 2017 at Defendant's request. Dr. Herbert saw no outward pain manifestations during passive observation of the Plaintiff. Plaintiff reported no pain with elbow, wrist, and hand movement. He did report low back pain, but Dr. Herbert saw no objective basis for it. A radiograph of Plaintiff's low back showed only mild wedging at the L1 disk. There was a reduced range of right shoulder motion, but full strength (albeit with "give-way weakness"). Dr. Herbert observed tenderness over the bicep tendons, and she attributed his shoulder pain to the past surgeries and tendinopathy. Dr. Herbert observed decreased sensation around the left ankle. In terms of work ability, Dr. Herbert recommended reduced walking. She also opined that right upper extremity use would be limited to carrying five pounds frequently and ten pounds occasionally given the decreased range of motion. Pushing or pulling with the right arm and crawling were reduced to an occasional basis. Dr. Herbert advised against ladder climbing. AR 1730–38.

Shortly thereafter, on March 20, 2017, Dr. Tyler wrote an IME report. Dr. Tyler reviewed the treatment history and performed his own examination. Plaintiff complained of pain during range of motion exercises, and Dr. Tyler noted myofascial trigger points. However, there was full upper extremity strength. He diagnosed myofascial pain syndrome and fibromyositis primarily in the right shoulder region, and he noted evidence of partial tendon tears in the left shoulder. He said that MMI was reached on November 21, 2016 and gave a fourteen percent whole person impairment rating. He recommended treatment in the form of medication management. AR 3046–60.

On April 21, 2017, Dr. Bristow rated Plaintiff's Residual Functional Capacity ("RFC"). He did so as a non-examining agency advisor, based on his review of the available medical records. AR 111.

Plaintiff continued seeing Dr. Davis for treatment of his right ankle. He complained of ongoing pain, but Dr. Davis saw no objective abnormality to explain it. Dr. Davis described the fracture as uncomplicated and minimal. AR 1883, 1888, 1898. At an appointment on July 5, 2017, Dr. Davis observed some tendinitis, which she attributed to the ankle's prolonged immobilization. There also was tenderness, but not at the fracture site. Dr. Davis diagnosed a very atypical fracture callus. AR 1881.

Plaintiff complained of loss of feeling in his right foot as well. Nerve conduction testing in July 2017 showed some signs of neuropathy in the extremity. AR 1869, 1876–78.

In June 2017, Plaintiff saw Ms. Christensen and Dr. Sears at Dr. Hatzidakis' medical practice with complaints of ongoing left elbow pain since the car accident despite extensive physical therapy. Dr. Sears recommended surgery. AR 1850, 1852. On August 30, 2017, both Dr. Sears and Dr. Hatzidakis filled out a form regarding activity restrictions from the left elbow sprain. They limited lifting to ten pounds an occasional basis and reaching only rarely. Right upper extremity use was not restricted at all. AR 1914, 1916.

Also in June 2017, Rodney Wilson wrote a vocational evaluation report. Mr. Wilson reviewed Plaintiff's medical history, work history, and education, and he administered an aptitude test. Based on his record review and the limitations opined by Dr. Olson, Mr. Wilson concluded that Plaintiff is disabled. AR 279–85.

Plaintiff was receiving treatment for other matters at this time. He still was taking Coumadin that was prescribed for a deep vein thrombosis when his left leg was in a cast after the car accident. AR 993, 2055. Plaintiff reported the cardiac symptoms of intermittent chest pain and shortness of breath. A stress test was abnormal. AR 2084, 2163. He received a stent on July 11,

2017 and was placed on Plavix. AR 2084. He sleeps with a CPAP mask because of moderate obstructive sleep apnea. AR 2154.

On August 2, 2017, Plaintiff sought treatment for injury to his left foot after someone had stepped on it at a concert. Dr. Ritter diagnosed minimally displaced fractures and recommended conservative treatment. AR 2043, 2047. On September 11, 2017, Dr. Freeman diagnosed a left arch fracture, and he attributed the left foot numbness and weakness to the tibia fracture repair surgery. AR 2142.

Dr. Shank evaluated the left foot fracture on September 19, 2017, for which he recommended wearing a therapeutic shoe. He described the fibula fracture on the right ankle as healed, and he was unsure about the cause of the abnormal nerve condition study. AR 1987. Dr. Shank also filled out an RFC questionnaire. For this period of time, while Plaintiff continued to receive treatment for the left foot injury, Dr. Shank limited work duty to sitting only and no lifting or standing. He advised Plaintiff to keep his foot elevated. AR 1985. Otherwise, Dr. Shank declined to give an impairment rating. AR 1988.

An MRI was taken of Plaintiff's lumbar spine on September 28, 2017. There were mild findings at the L5/S1 disks and a old compression deformity of mild severity at the L1 disk. AR 1938. A whole body bone scan showed areas of old trauma or arthritis. AR 1932. By contrast, a later radiograph showed only mild bone loss (osteopenia) but no arthritis. AR 2228.

On October 12, 2017, Dr. Ritter examined Plaintiff's left lower extremity. He still was wearing a therapeutic shoe, and he was complaining about the loss of feeling. Upon examination, Dr. Ritter saw no signs of tenderness or pain with toe movement. A radiograph showed reasonably aligned fractures and good callus formation. Dr. Ritter diagnosed closed displaced fractures of the

left foot bones with routine healing. Plaintiff was discharged from care with no need for further treatment. AR 2043.

Dr. Freeman evaluated Plaintiff's complaints of extremity neuropathy on November 6, 2017. He suspected alcohol and pre-diabetes as a possible cause for the polyneuropathy, and he recommended another nerve conduction study. He suspected an impinged nerve root at the L1/S2 disk site based on the recent MRI, and he saw signs of sciatic nerve innervation and muscle weakness during the physical examination. AR 2127.

Plaintiff reported shortness of breath with activity, which was attributed to smoking-related emphysema and deconditioning. AR 2089, 2122, 2124, 2158. Improved diet and exercise were recommended. AR 2083. Plaintiff also sought treatment for sinus problems for which he requested surgery, and he sought treatment for gastric discomfort. AR 2073, 2078, 2263. Physical examinations performed at these appointments were unremarkable. AR 2073, 2083.

Beginning in June 2018, Plaintiff complained about lower extremity swelling as well as arthritic pain and stiffness. Physical examinations were largely unremarkable. AR 2229, 2246, 2263, 3208.

## II.      Disability Claim and Hearing Testimony

In his application paperwork, Plaintiff claimed disability based on a variety of medical conditions and impairments. AR 225, 261. Plaintiff repeated those claims at the administrative hearing held October 31, 2018. He identified shoulder problems, left elbow and wrist issues, carpal tunnel syndrome, low back pain, knee problems, lower extremity bone fractures, and lower extremity neuropathy. He included cardiac and respiratory conditions as well as sleep apnea. He uses a cane to walk. AR 45–96.

## THE FIVE-STEP PROCESS FOR DETERMING DISABILITY

To qualify for SSA benefits, the claimant must meet the insured status requirements, be under age 65, and be disabled. 42 U.S.C. §§ 416(i), 423, 1382. A five-step sequential evaluation process guides the determination of whether an adult claimant meets SSA's definition of disabled. For SSA purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One asks whether the claimant is presently engaged in substantial gainful activity. If he is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant shows only a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. 20 C.F.R. 404.1520(c). Step Three tests whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, then disability is not presumed. Step Four requires the claimant to show how his impairment(s) and RFC prevent him from performing his past jobs. If the claimant remains capable of previous employment, he is not disabled. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).

Finally, if the claimant establishes a prima facie case of disability at Step Four, the analysis proceeds to Step Five where Defendant has the burden to demonstrate claimant's ability to perform

other work in the national economy in view of his age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## ALJ's RULING

At Step One of the disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 1, 2012, his alleged disability onset date. AR 17. At Step Two, the ALJ determined that Plaintiff had a range of severe impairments. Affecting his upper extremities were the severe impairments of right shoulder impingement, tendonitis, osteoarthritis, status post rotator cuff tear with impingement, scapular dyskensis, right-sided carpal tunnel syndrome, and left rotator cuff tear. Affecting his lower extremities were the severe impairments of status post left tibial pilon fracture with open reduction and internal fixation surgery, left ulnar collateral ligament tear, status post right ankle fracture with tendonitis, and neuropathy of the right sural, superficial peroneal, and lateral plantar nerves. Additional severe impairments were status post L2 compression fracture and obstructive sleep apnea. However, the remaining medical conditions did not rise to the level of a "severe impairment" for Step Two purposes. They were inguinal hernia, umbilical hernia, and orchitis; obesity; deep vein thrombosis in the left leg; coronary artery disease, stenting, and hyperlipidemia; asthma, allergies, and deviated nasal septum; dermatitis and epididymitis; and digestive conditions. AR 18–19. None of Plaintiff's medical conditions were of Listing-level severity to permit a Step Three finding of disabled based on the medical evidence alone. AR 19-20.

At Step Four, the ALJ assessed an RFC for a reduced range of light work. The ALJ found him capable of the exertional demands of light work: lifting or carrying twenty pounds on an occasional basis and ten pounds on a frequent basis. He can stand and/or walk for four hours and sit for six hours in a workday. The ALJ added a range of non-exertional impairments affecting

upper extremity use. With his left arm, he can reach overhead only occasionally (but can reach in all other directions frequently). With his right arm, he can never lift or do work activity at or above shoulder level (but can reach in all other directions frequently). He can handle, finger, or operate hand controls with both upper extremities frequently. The ALJ limited lower extremity use to only occasional foot control operation. The Plaintiff never can crawl nor climb ladders, ropes, or scaffolds. He can stoop, kneel, crouch, or climb ramps and stairs only occasionally. He must avoid all exposure to hazards including unprotected heights, commercial driving, or heavy machinery operation. AR 21.

Because the RFC precludes Plaintiff's return to his past relevant work (AR 32), the ALJ proceeded to Step Five to determine the availability of other, more amenable employment. The ALJ found a person with Plaintiff's RFC, age (49 years old), and education (high school), able to perform the jobs of small product assembler, electronics worker, and toll collector. AR 33. In making that finding, the ALJ relied on the testimony of the vocational expert (AR 33) but gave little weight to the vocational evaluator's report (AR 31). Because there are jobs that Plaintiff still can do despite his medical impairments, the ALJ concluded that he was not disabled. AR 33.

## **STANDARD OF REVIEW**

Judicial review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir.

1978). The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

The substantial evidence standard tests whether the administrative record contains sufficient evidence to support the factual determinations. The term "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The threshold for such evidentiary sufficiency is not high: it is "more than a mere scintilla." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). However, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

Reversal also is appropriate if the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

## ISSUE ON APPEAL

Plaintiff objects to that portion of the RFC assessment concerning his ability to lift and carry weight (and with respect to the statements by Dr. Sears and Dr. Hatzidakis, his ability to reach with his left arm). Therefore, the Court reviews in detail the ALJ's findings relevant to the appeal issue.

## I.    Right Arm and Shoulder

The ALJ referred to the Function Report that Plaintiff filled out for his disability application. There, Plaintiff reported being able to lift up to fifteen pounds with his right arm and up to sixty-five pounds with his left arm. AR 21 (citing AR 255). The ALJ also referred to

Plaintiff's hearing testimony. AR 22. The Court notes that at the hearing, Plaintiff testified that he "can pretty much lift weight-wise" something that is directly in front of him, but he can lift no more than ten pounds off the ground. AR 62, 67.

The ALJ acknowledged the various right shoulder diagnoses since the December 2011 work injury. The ALJ also accounted for the treatment history consisting of four surgeries and extensive, ongoing physical therapy (although no prescribed pain medication). AR 23. Despite the considerable treatment provided, Plaintiff continues to report ongoing pain and decreased functional ability.

The ALJ saw no evidence to confirm the severity of the alleged pain complaints. AR 25. Treating and examining sources often were unable to corroborate his pain reports. Some examinations showed a good range of motion. AR 22 (citing the treatment notes of Ms. Christensen and Dr. Hatzidakis at AR 1858, 1860). Plaintiff has maintained full or nearly full arm strength. AR 22 (citing Ms. Christensen's treatment note at AR 1858; Dr. Tyler's examination at AR 3058; Dr. Herbert's examination at AR 1735; and Dr. Lindberg's examination at AR 1580). An MRI taken on May 31, 2015 (AR 1094) showed the right shoulder to be intact without significant bone spurring or osteoarthritis. AR 22 (citing Ms. Christensen's treatment note at AR 1858).

The ALJ gave very little weight to the impairment questionnaire that Dr. Shank filled out on September 19, 2017. AR 29 (citing AR 1985–86). Dr. Shank filled it out soon after Plaintiff's left foot injury at the concert and limited him to sitting duty. AR 29. Dr. Shank also limited lifting, but in the context of the left foot injury. Consequently, it does not relate to the Plaintiff's ability to lift and carry with his upper extremities that is at issue on appeal. Nevertheless, the ALJ stated several reasons for giving Dr. Shank's opinion statement very little weight.

On November 22, 2016, Dr. Olson opined that the right shoulder had reached MMI. AR 22–23 (citing AR 1638–40). Dr. Olson limited lifting to ten pounds on an occasional basis with the right arm and only to chest level. Dr. Olson added a limitation against forceful pushing, pulling, or torqueing with the right arm. *Id*. Dr. Olson repeated that same weight restriction after examining Plaintiff on January 3, 2017. AR 25 (citing AR 1669–70). The ALJ gave his opinion "significant weight" overall. AR 25. The ALJ did not regard Dr. Olson as a "long-term treating provider," but he did examine Plaintiff. Moreover, he reviewed the records of his colleagues who had treated Plaintiff within the same practice. *Id*.

On March 2017, Dr. Tyler wrote an independent medical examination report, in which he agreed with Dr. Olson. AR 22 (citing AR 3046-60). Although Dr. Tyler was not a treating source and only examined Plaintiff once, the ALJ still gave his opinion significant weight because he was very familiar with Plaintiff's treatment history. AR 25. Moreover, Dr. Tyler observed Plaintiff's right shoulder to have nearly full strength. AR 26 (citing AR 3058).

Next, the ALJ explained why he gave *less* weight to the *lifting and carrying* restriction that Dr. Olson and Dr. Tyler had added. The ALJ saw insufficient findings of weakness in the treatment records overall to support it; nor did the doctors cite any specific references. The ALJ doubted whether the doctors used the term "occasional" according to its specific definition in the SSA context. The ALJ was unsure what the restriction against "forceful pushing, pulling, or torqueing with the right arm" meant in RFC terms. AR 25. Lastly, the overall record did not suggest a degree of limitation greater than what the ALJ accommodated in the RFC assessment. AR 27.

The ALJ discussed Dr. Herbert's report from March 18, 2017, noting how she examined Plaintiff only once, on a consultative basis, and not as a treating source. AR 27. Dr. Herbert opined that Plaintiff could *carry* ten pounds occasionally and five pounds frequently with his right arm.

AR 27 (citing AR 1730–38). Dr. Herbert based that limitation on the limited range of right shoulder motion, but because the ALJ saw no relationship between limited motion range and weight-bearing ability, the ALJ gave that opinion little weight. The ALJ addressed how Dr. Herbert "does not explain why decreased range of motion in the right shoulder would limit his ability to carry weight, particularly when she only noted give-away weakness in the right upper extremity without any signs of atrophy. Absent any notable deficits in strength or other meaningful measure of strength that might correlate to a decreased ability to lift, Dr. Herbert's limitation in this area is not supported by or consistent with her own findings." AR 27.

The ALJ also observed how Dr. Herbert omitted how much weight Plaintiff could *lift* with his right arm. Nor did Dr. Herbert consider how much weight Plaintiff could lift and carry with *both* arms. AR 28.

The ALJ gave little weight to Dr. Herbert's opinion that Plaintiff can use his right arm for pushing or pulling on only an occasional basis. Dr. Herbert provides no rationale to explain that limitation, the ALJ explained, and the overall record indicates no limitation beyond the RFC assessment. AR 27. Because Dr. Herbert provides no "support or explanation for why this limitation is necessary," the ALJ gave it little weight even though as a Social Security consultant, "she is better versed in the functional meaning of occasional than [Dr. Olson or Dr. Tyler]." AR 27-28. However, the ALJ did give "significant weight to the portion of her opinion that [Plaintiff] should never carry more than ten pounds with his right upper extremity." AR 27.

On April 21, 2017, Dr. Bristow, a non-examining agency physician, rated Plaintiff capable of a reduced range of light exertional work. AR 25 (citing AR 107–11). Overall, the ALJ found the RFC rating to be "partially consistent with the evidence showing that [Plaintiff] had some limitations to his ability to lift and carry heavy objects and to use his upper extremities due to his

shoulder." AR 25. However, because Dr. Bristow did not consider all of Plaintiff's limitations fully, he gave it "only some weight." AR 25. The ALJ did not expressly address Dr. Bristow's opinion that Plaintiff can lift twenty pounds occasionally and ten pounds frequently (AR 107).

In May and June of 2005, Dr. Bradley considered Plaintiff's functional ability after a much earlier slip-and-fall. AR 30 (citing AR 288-320). Dr. Bradley imposed no significant lifting or carrying restriction. Nevertheless, because it predates Plaintiff's alleged onset date by many years, the ALJ gave his opinion no weight. AR 30.

## II.     Left Arm and Shoulder

The ALJ referred to Plaintiff's Function Report in which he stated that he could lift up to sixty-five pounds with his left arm. AR 21 (citing AR 255). The ALJ also noted Plaintiff's hearing testimony. AR 22.

The ALJ reviewed the relevant treatment history. Surgery was performed on Plaintiff's left shoulder in 2006. AR 23. More recently, on April 19, 2016, an MRI was taken, and it showed partial tendon tears. AR 23 (citing AR 1003). On September 1, 2016, Dr. Hatzidakis observed Plaintiff's left shoulder to have good strength. AR 23 (citing AR 1003). Dr. Tyler described the left shoulder as being less impaired than the right. AR 23 (citing AR 3058).

In identical questionnaires filed out on August 30, 2017, Dr. Hatzidakis and Dr. Sears considered Plaintiff's upper extremity functional ability in light of the left elbow sprain diagnosis. AR 1914–17. They limited the maximum weight Plaintiff can lift or carry for up to one-third of a workday (*i.e.*, on an occasional basis) to ten pounds, and stated that he can reach with his left arm only rarely.

The ALJ gave very little weight to their opinions. First, the ALJ noted how the two doctors expressed no limitations specific to Plaintiff's right arm despite Dr. Hatzidakis' familiarity with

its treatment history. The absence of any right arm restrictions caused the ALJ to doubt the reliability of the rest of their opinion. AR 28. Second, Dr. Hatzidakis did not treat Plaintiff's left arm and had not examined him at all after June 19, 2017. AR 28. Instead, Dr. Hatzidakis relied on Dr. Sears' treatment records to render an opinion on Plaintiff's left arm, which to that extent made Dr. Hatzidakis a non-examining source. Dr. Sears, in turn, had treated Plaintiff only once, on June 19, 2017, and he relied on the June 6, 2017 treatment note by Ms. Christensen. AR 28. Third, the doctors did not say that the impairment would continue for a year or more, and the subsequent medical records did not show the left elbow condition to remain a problem thereafter. AR 29.

### III.    Workers Compensation Records

The ALJ considered the Workers Compensation records. On December 28, 2011, three days after the snow shoveling work injury, Plaintiff was doing sedentary level work. AR 30 (citing AR 321). On July 30, 2014, Plaintiff's work status was described as "Limited Duty." AR 30 (citing AR 3080). On August 17, 2015, Dr. Paz filled out a form stating that Plaintiff has no ability to lift or carry weight due to his right shoulder condition. AR 30 (citing AR 2498). When Plaintiff was discharged from physical therapy on August 8, 2017, "limitation with carrying, moving and handling objects" was noted. AR 30 (citing AR 3083). Conversely, other forms placed *no* restrictions on shoulder functioning. AR 30 (citing AR 1587). The ALJ gave all of the above opinion statements little weight for presenting a wide variety of ever changing limitations none lasting a year. They were not statements about the most Plaintiff can do, and they were less relevant and less detailed than the opinion statements that the ALJ did discuss. AR 30.

The ALJ also considered medical records from prior Workers Compensation claims. The ALJ gave those earlier opinion statements no weight because they were rendered long before the present alleged onset date and because Plaintiff since had returned to work. AR 30.

IV.     **Relevant Part of the RFC Assessment**

The ALJ determined Plaintiff's ability to do basic work "in the context of the medical evidence, opinion evidence, and the other evidence of record, as discussed above in detail." AR 31. The ALJ found that Plaintiff's ability to lift and carry was limited, more so on the right side given the extensive treatment for his right shoulder and his allegations of ongoing pain. Nevertheless, Plaintiff retained "mostly normal strength" and was neurologically intact. AR 31. The ALJ found the medical conditions affecting his shoulders and arms to manifest other kinds of work-related impairments that were incorporated into the RFC assessment and which Plaintiff does not appeal. AR 31. As for his ability to lift and carry, the ALJ limited him to twenty pounds occasionally and ten pounds frequently. The ALJ limited right upper extremity lifting to ten pounds. The ALJ placed no maximum on left arm lifting.

<u>**ANALYSIS**</u>

Physicians opined about how Plaintiff's shoulder conditions affect his ability to lift and carry. Plaintiff argues that the ALJ gave several of those opinion statements too little weight and instead gave too much weight to the advisory RFC rating of the non-examining source.

I.      **Dr. Olson's Lifting Restrictions**

Dr. Olson limited lifting to ten pounds on an occasional basis with the right arm and only to chest level, and he precluded forceful pushing, pulling, or torqueing with the right arm. Plaintiff considers Dr. Olson to be a treating source, whereas the Defendant characterizes him as an examining source with extensive knowledge about Plaintiff's treatment history. The ALJ placed Dr. Olson's status in the middle of those two positions: not a *long-term* treating source but still very knowledgeable about Plaintiff's condition. Regardless, even if Dr. Olson counts as a treating source, the ALJ stated an adequate basis to discount his opinion.

As a general rule, the medical opinion of a treating source is given great weight, and if it is well-supported by the medical evidence and not inconsistent with the other substantial evidence of record, it is given controlling weight. However, after considering the 20 C.F.R. § 404.1527(c)(2) factors, an ALJ may decide to give it less weight. Here, the ALJ stated several reasons for doing so with respect to Dr. Olson.

For one, the ALJ was not certain whether Dr. Olson used the term "occasional" according to the SSR 83-10 definition meaning up to one third of the time. Plaintiff regards that particular finding as too speculative to be an adequate reason.

Even if Plaintiff is correct on that point and assuming that Dr. Olson did mean "occasional" as SSA defines it, the ALJ's additional finding that the medical evidence does not support the restriction is sufficient. Plaintiff retained full or nearly full strength consistently over the course of the treatment history. For example, Dr. Tyler, whose opinion the ALJ considered in conjunction with Dr. Olson, observed Plaintiff to have nearly full strength in his right shoulder. Inconsistency with the objective medical evidence is a permissible reason for discounting treating source opinion. 20 C.F.R. § 404.1527(c)(4).

The inconsistency between the observations of full strength and the lifting restriction heightened the need for Dr. Olson to cite supporting evidence. "The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion." 20 C.F.R. § 404.1527(c)(3). The ALJ expressly relied on that factor. Plaintiff says that Dr. Olson did cite objective findings to support his opinion: "tenderness along the anterior portion of the shoulder by his biceps tenodesis scars" and a reduced range of motion. AR 1639. The ALJ considered those points. The ALJ addressed the issue of chronic pain, explaining that it does not constitute a medical impairment in

its own right. AR 19. The ALJ also addressed the reduced range of shoulder motion, accounting for it in the RFC assessment in other ways. However, the ALJ explained why the range of motion impairment is distinct from, and does not affect, lifting ability.

The Court finds no reversible error in the ALJ's decision to discount Dr. Olson's lifting restriction. Regardless, there was little difference between what Dr. Olson opined and what the ALJ assessed. Dr. Olson opined that Plaintiff can lift up to ten pounds on an occasional basis with his right arm, which is what the ALJ assessed. The ALJ also found Plaintiff able to lift or carry twenty pounds occasionally or ten pounds frequently with *both* arms. However, Dr. Olson considered Plaintiff's ability to lift only with respect to his *right* arm.

## II.     Dr. Herbert's Lifting Restrictions

Dr. Herbert examined Plaintiff on a consultative basis at the Defendant's request. As a one-time examining source, her opinion is given less weight than a treating source. However, it still is a medical opinion that the ALJ must evaluate pursuant to 20 C.F.R. § 404.1527(c). *Martinez v. Comm'r*, 777 F. App'x 930, 935-36 (10th Cir. 2019).

Dr. Herbert stated that Plaintiff "should be able to carry 5 pounds frequently and 10 pounds occasionally right upper extremity per review of outside records given limited shoulder range of motion." AR 1737. The focus of the limitation was on the right arm and shoulder, consistent with her findings of reduced range of right shoulder motion. Moreover, Dr. Herbert considered weight-bearing ability with respect to *carrying* only, and not lifting and carrying together.

The ALJ discounted Dr. Herbert's limitations on how much weight Plaintiff can carry with his right arm because he retained full upper extremity strength. Dr. Herbert, herself, measured full upper extremity strength with only "give-way weakness noted." AR 1735. Plaintiff criticizes the

distinction between range of motion and lifting as illogical, and he furthers that the ALJ impermissibly substituted his own lay opinion for the doctor's.

The ALJ's finding was proper. First, the ALJ accurately recounted the objective findings of both Dr. Herbert, specifically, and the other examining doctors, generally. Consistent in the overall record is the discrepancy between observations of full or nearly full strength and observations of a reduced range of right shoulder motion. Second, the ALJ addressed the matter in a substantive way. While Plaintiff may believe that range of motion affects weight-bearing, he does not show how the ALJ's resolution of that particular fact issue was necessarily erroneous. Nor did the ALJ's analysis end there. The ALJ gave reasons for discounting the other related limitations that Dr. Herbert added.

Taken together, the ALJ stated sufficient reasons for discounting Dr. Herbert's opinion.

### III.    Dr. Bristow's RFC Opinion

Dr. Bristow was an agency physician who rated Plaintiff's functional ability based on a review of the available medical record. As such, his opinion is entitled to less weight than one from an examining source. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527). Nevertheless, the ALJ still must explain the weight Dr. Bristow's opinion should have. SSR 96-6p. The ALJ took it into consideration and gave reasons for according it some weight.

Plaintiff's first objection is that the ALJ should have given Dr. Bristow's opinion even less weight than he did. Plaintiff notes the opinion's forward-looking aspect. On April 21, 2017, Dr. Bristow considered what Plaintiff's functional ability would be on January 1, 2018, after a period of normal healing. Plaintiff argues that the ALJ did not verify that the anticipated healing and improvement actually had happened. However, Dr. Bristow's RFC rating was not solely predictive

in nature. It also applied during the time period between the alleged onset date and January 1, 2017. AR 106. Nor is the healing period that Dr. Bristow considered relevant to upper extremity functioning. He rendered his opinion after Plaintiff had injured his right ankle, a condition unrelated to the right shoulder. Plaintiff points out that Dr. Bristow did not have the benefit of the full medical record, a fact which the ALJ acknowledged. The Court finds no error in the ALJ's decision to give the RFC rating some weight.

Plaintiff next objects that the ALJ gave Dr. Bristow *too much* weight. Dr. Bristow opined that Plaintiff can lift twenty pounds occasionally and ten pounds frequently, which is the same exertional ability that the ALJ assessed for the RFC. The Plaintiff argues that the ALJ thereby implicitly gave Dr. Bristow's rating full weight, and to credit the opinion of a non-examining medical advisor over her treating doctors was in error.

The flaw in Plaintiff's objection is that the ALJ did not simply credit it over the others. This case does not present the situation where an ALJ rejected extensive treating source opinions for plainly inadequate reasons, as in *Hamlin v. Barnhart*, 365 F.3d 1208 (10th Cir. 2004), or gave inadequate reasons for crediting one non-treating examining source and inadequate reasons for discounting the other non-treating examining source, as in *Quintero v. Colvin*, 567 F. App'x 616 (10th Cir. 2014). Here, the ALJ considered the medical opinion evidence on the whole and explained why the various opinions of treating and examining sources about Plaintiff's weight-bearing ability all should be given less weight. The ALJ gave Dr. Bristow's statement less weight as well. The Court finds no error in the ALJ's reasoning.

It does not necessarily follow that the ALJ based the exertional part of the RFC assessment on Dr. Bristow's report. By finding the evidence to show a weight-bearing ability *above* the sedentary work level, the ALJ naturally placed Plaintiff's ability at the next higher exertional level

of light work. The simple fact that the ALJ's assessment of Plaintiff's exertional ability is the same as Dr. Bristow's does not mean that the ALJ *improperly* chose it over examining source opinion.

Consequently, the Court sees no error in the ALJ's consideration of Dr. Bristow's RFC report.

## IV.    Dr. Sears' and Dr. Hatzidakis' Opinion Statement

Dr. Sears and Dr. Hatzidakis are treating sources, as the ALJ acknowledged, and as such, their opinions are generally entitled to great weight. Had the ALJ given their opinion statements from August 30, 2017 controlling weight, the ALJ would have found no right arm impairment at all. Indeed, the ALJ gave their opinion statements less weight because they accounted for no right arm restrictions. In that respect, the ALJ discounted their opinion statement in a way that *favors* Plaintiff's position.

Plaintiff argues that the ALJ should have accorded weight to a different part of their opinion statement, in which they limit lifting and carrying ten pounds occasionally and limited left arm reaching to only rarely. The ALJ did not give weight to that restriction because there was no indication how long it—or the left elbow sprain upon which it was based—would last. The subsequent medical records suggested that the elbow condition did not last for a year or longer. The ALJ also noted how the doctors lacked a longitudinal insight into the left arm condition.

Plaintiff notes how the ALJ found the left ulnar collateral ligament tear to be a severe impairment at Step Two of the analysis. Therefore, the ALJ could have assumed that the condition underlying the opinion statement was ongoing as well. As the factfinder, the ALJ could have resolved the evidence in that way. However, the ALJ resolved it differently, and he stated adequate reasons for doing so. The fact that the doctors indicated no time frame for their opined restrictions

remains a relevant point. Moreover, they expressly based their opinions on a sprain, not the ulnar tear.

The ALJ did not err by excluding their opined ten-pound lifting restriction from the RFC assessment. Their opinion was rendered in the context of a temporary injury to Plaintiff's left elbow.

## CONCLUSION

Several doctors considered Plaintiff's upper extremity functioning in a variety of contexts. As the factfinder, it was the ALJ's responsibility to consider those statements in light of the greater evidentiary record, to determine how much weight to give them, and from the whole evidentiary record, to assess the degree of impairment. The ALJ complied with that requirement by considering the medical record on the whole and addressing the various medical opinion statements in a substantive fashion. After doing so, the ALJ found Plaintiff not as impaired as several doctors had opined. However, the ALJ did not reject Plaintiff's disability claim entirely. By limiting him to a reduced range light work, the ALJ still made significant accommodation. Having reviewed the parties' arguments and having independently reviewed the whole record, the Court finds the ALJ's decision to enjoy evidentiary support and to be consistent with governing law. Consequently, the Court sees no grounds warranting reversal or remand.

Accordingly, the ALJ's determination that Plaintiff is not disabled is AFFIRMED.

Entered this 16th day of February, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge